UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                 :

NATURAL RESOURCES DEFENSE COUNCIL, INC.,  :
                                 :

                 Plaintiff,     :        13 Civ. 942 (PAE)
                                 :

              -v-           :        <u>OPINION & ORDER</u>
                                 :

UNITED STATES DEPARTMENT OF INTERIOR and  :
BUREAU OF LAND MANAGEMENT,
                                 :

                Defendants.   :
                                 :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/5/2014

PAUL A. ENGELMAYER, District Judge:

     This suit brought under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"),

concerns a request by the Natural Resources Defense Council ("NRDC") for records of coal-

mining leases previously awarded by the U.S. Department of Interior ("DOI") and Bureau of

Land Management ("BLM") (collectively the "Government") to private mining companies in the

Powder River Basin, in southeast Montana and northeast Wyoming.  These leases involved

billions of tons of coal.

     NRDC seeks the Government's coal appraisal records from those past awards in order to

determine whether BLM has complied with the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181–

287 ("Mineral Leasing Act" or the "Act"), specifically, the Act's requirement that the BLM sell

federal coal for no less than its fair market value.  *See id.* § 201(a)(1).  The Government has

produced such records, but it has redacted them pursuant to three FOIA exemptions: Exemptions

4, 5, and 9.  The parties cross-move for summary judgment on the propriety of those redactions.

For the reasons that follow, each party's motion for summary judgment is granted in part and

denied in part.

I.      **Background**[1]

    **A.  The FOIA Request**

On September 21, 2012, NRDC submitted a FOIA request to the Government.  Forsyth

Decl. Ex. A.  It sought (1) "all information and analysis documents used to appraise" each of the

Powder River Basin tracts that BLM had leased since 1990, and (2) "[a]ny Interior [D]epartment

guidance, handbooks, manuals or similar documents with information on estimating the value of

coal tracts."  *Id.*  The Government did not, at that time, respond.  Neuman Decl. ¶ 4; Pl. 56.1

¶ 34.

    On February 8, 2013, NRDC filed this lawsuit.  Dkt. 1.  The Government then produced

the requested handbooks and manuals (on March 5, April 15, and April 25, 2013).  Neuman

---

[1] The Court's account of the facts is derived from the parties' submissions in support of and in opposition to the instant motions, including NRDC's Local Rule 56.1 Statement, Dkt. 14 ("Pl. 56.1"); the exhibits attached to the Declaration of Elizabeth Forsyth, Dkt. 17 ("Forsyth Decl."), including Ex. E ("NARO North Appraisal Report"), Ex. F ("NARO North Economic Report"), Ex. G ("NARO North Engineering Report"), Ex. H ("NARO North Geologic Report"), Ex. I ("West Antelope II North Appraisal Report"), Ex. J ("West Antelope II South Appraisal Report"), Ex. K ("West Antelope II Economic Report"), Ex. L ("West Antelope II Engineering Report"), Ex. M ("West Antelope II Geologic Report"), and Ex. S (U.S. Dep't. of the Interior Office of Inspector General, *Coal Management Program* (June 2013)) ("Inspector General"); the Declaration of Steven Hageman, Dkt. 24 ("Hageman Decl."); the Declaration of Brenda Neuman, Dkt. 25 ("Neuman Decl."); and Exhibit FF to the Second Supplemental Declaration of Elizabeth Forsyth, Dkt. 50 (U.S. Government Accountability Office, GAO-14-140, Coal Leasing: BLM Could Enhance Appraisal Process, More Explicitly Consider Coal Exports, and Provide More Public Information (Dec. 18, 2013)) ("GAO").

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Decl. ¶ 5.  BLM, upon review of its records, determined that 27 Powder River Basin tracts had

been leased since 1990, and that the information and analysis documents used to appraise each

tract consisted of an appraisal report, an economic report, an engineering report, and a geologic

report.  Hageman Decl. ¶ 13.  BLM also determined that certain information in each of the

reports was subject to one or more exemptions under FOIA, and that the exempted information

would be similar for each tract.  *Id.*

The parties thus agreed to have the Government release redacted records and Vaughn

indices related to two completed lease sales—NARO North and West Antelope II—and to have

the NRDC challenge any redactions or withholdings of documents as to those two sales.  Dkt. 9;

Pl. 56.1 ¶ 36.  The parties agree that the resolution of NRDC's challenges to the Government's

withholding of information pursuant to FOIA for these two lease sales would govern the other 25

lease sales.  Dkt. 9 ¶ 6; Pl. 56.1 ¶ 37.

On June 5, 2013, the Government produced (1) redacted copies of the four reports for the

NARO North and West Antelope II leases and (2) three Vaughn Indices (one each for the reports

for both leases, and one for the computer models the Government used to value both leases).

Forsyth Decl. Ex. B–M; Pl. 56.1 ¶ 38.  The Government redacted content in the reports, citing

FOIA Exemptions 4, 5, and 9, and withheld the computer model entirely, citing FOIA

Exemption 5.  Forsyth Decl. Ex. B–M; Pl. 56.1 ¶ 39.

In brief, the Government asserted that certain information in the reports was confidential

to the mining companies that had submitted that information, and that the Government's own

analysis in appraising the tracts would, if released, harm the government's ability to maximize

revenue from future leases.  Forsyth Decl. Ex. B–D.  The Government also asserted that certain

3

information contained in the geologic reports was derived from private drill holes and therefore protected under Exemption 9.  *Id.*

On July 2, 2013, NRDC objected to all redactions and withholdings and to the adequacy of the Vaughn Indices.  Forsyth Decl. Ex. N; Pl. 56. ¶ 41.  On August 15, 2013, the Government agreed to release a subset of the redacted material, to accord with material that had been previously produced to a prior FOIA requester.  Forsyth Decl. Ex. O; Pl. 56.1 ¶ 42.  Otherwise, however, the Government refused to produce unredacted copies of the reports, to produce the computer models, or to revise its Vaughn Indices.  Forsyth Decl. Ex. O; Pl. 56.1 ¶ 42.  The instant motions for summary judgment followed.

### B.  Federal Coal and the Powder River Basin

The Mineral Leasing Act gives the Secretary of the Interior the authority to lease public lands for coal mining operations after conducting a competitive bidding process.  *See* 30 U.S.C. § 201(a)(1).  Coal production from federal leases averages about 450 million tons per year and produces about $1 billion in annual revenue.  GAO at 21–22.  Of that revenue, some two-thirds come from royalties for the sale of coal; one-third comes from payments for leases.  *Id.* at 23, 25.  Four lessee companies account for more than 90 percent of federal coal sales.[2]  Inspector General at 3–4.

The Powder River Basin contains one of the largest coal deposits in the world.  Pl. 56.1 ¶ 1.  It produces more than 40% of this nation's coal.  *Id.* ¶ 2.  The basin contains the nation's 10 top-producing coal mines, nine of which are in the Wyoming portion of the basin.  GAO at 10.  Almost the entire basin is controlled by BLM, which sells coal leases to private coal mining

---

[2] These four companies are Alpha Natural Resources; Arch Coal, Inc.; Cloud Peak Energy, Inc.; and Peabody Energy Corporation.  Inspector General at 4.

companies for up to hundreds of millions of dollars.  Pl. 56.1 ¶¶ 5–6.  Coal in the Powder River

Basin is especially attractive because production costs are low, transportation networks are

readily accessible, and the coal has less sulfur than does coal from the eastern United States,

enabling utilities to meet emissions limits under the Clean Air Act.  GAO at 20.

There are currently 13 active coal mines in the Wyoming portion of the Powder River

Basin, operated by five principal companies.[3]  Hageman Decl. ¶ 4.  Since 1990, 28 tracts have

been offered in competitive lease sales in the Wyoming portion of the Powder River Basin, 27 of

which have been leased.  Hageman Decl. ¶ 5.  There are currently seven lease sales pending in

the Powder River Basin, for a total of more than four billion tons of coal.  Pl. 56.1 ¶ 9.

### C.  The Coal Leasing Process

"Since 1990, all federal coal leasing has taken place through a lease-by-application

process where coal companies propose tracts of land to be put up for sale by BLM."  GAO at 2.

These tracts, called "maintenance tracts," "are generally adjacent to existing mining operations

and are nominated by companies that own these operations."  GAO at 7; *see also* Hageman Decl.

¶ 6 ("The applicant is almost always the mining company that owns the mine adjacent to the

subject tract.").  Coal companies typically seek to maintain a 10-year coal supply at their existing

mining operations.  GAO at 17.  By adding a maintenance tract, the coal company can "extend

the life of an existing mine or [ ] expand that mine's annual production."  GAO at 16.

The process generally begins when a coal company requests a license from BLM to

explore an area for coal production.  43 C.F.R. § 3410.2-1; Inspector General at 4; Pl. 56.1 ¶ 10.

If the exploration is successful, the company submits a "lease by application" or "LBA" request.

---

[3] These five companies are Kiewit Mining Group, Inc.; Alpha Wyoming Land Company, LLC;
Cloud Peak Energy, Inc.; Peabody Energy Corporation; and Arch Coal, Inc.  Hageman Decl. ¶ 4.

43 C.F.R. § 3425.1–7; Inspector General at 4; Pl. 56.1 ¶ 11.  "The LBA request contains public

information such as the geographic coordinates and size of the proposed lease, expected

production volumes, quality of the coal, and a mine plan detailing such information as the coal

extraction methods, disposition and use of the coal, and a reclamation plan for restoring the land,

which is used by the BLM as part of its environmental analysis."  Hageman Decl. ¶ 6; *accord*

Inspector General at 4.  "BLM reviews the LBA request and asks the lease applicant if it is

willing to provide additional confidential information concerning the geology, fluid resources,

engineering, and economics of existing mine operations or holdings both in conjunction with the

applied-for LBA tract and without the tract."  Hageman Decl. ¶ 7.  BLM also decides on the final

size and shape of the tract.  *Id.*

  Under the Mineral Leasing Act, BLM cannot accept less than "fair market value" (or

"FMV") for the award, known as a sale, of a coal lease.  Accordingly, before every lease sale,

BLM must make an assessment of the fair market value of the lease tract's coal.  Fair market

value is defined under federal regulations as the cash value at which a knowledgeable owner

would sell or lease the land to a knowledgeable purchaser.[4]  The estimate of fair market value,

_____

[4] The Definitions section of BLM's coal management regulations states that "[f]air market value
means that amount in cash, or on terms reasonably equivalent to cash, for which in all probability
the coal deposit would be sold or leased by a knowledgeable owner willing but not obligated to
sell or lease to a knowledgeable purchaser who desires but is not obligated to buy or lease."  43
C.F.R. § 3400.0-5(n) (2013).  *See also* West Antelope II North Appraisal Report at 14–15
(quoting a similar definition from the Uniform Appraisal Standards for Federal Land
Acquisitions and the definition from 43 C.F.R. § 3400.0-5(n)).  Steven Hageman, the longtime
Mineral Appraiser for the BLM Wyoming State Office, opines that fair market value "under the
applicable regulations represents the *minimum* acceptable bid that a willing and knowledgeable
seller could accept for the offered tract.  *See* 43 C.F.R. § 3422.1(c)(1)."  Hageman Decl. ¶ 8
(emphasis added).  Technically, the regulatory section that Hageman cites, however, does not
state that fair market value means the *minimum* acceptable bid; instead, 43 C.F.R. § 3422.1(c)(1)
reads in full: "The authorized officer shall not accept any bid that is less than the fair market
value as determined by the Department."

generally expressed in cents per ton of recoverable coal, is kept confidential.  GAO at 8; Pl. 56.1 ¶ 17.

BLM then publicly announces the sale and solicits sealed bids.  43 CFR §§ 3422.2 & 3422.3; Hageman Decl. ¶ 10; Pl. 56.1 ¶ 12.  At the close of the sale period, BLM awards the lease to the company submitting the highest bid, as long as the company is qualified to hold the lease and the bid meets or exceeds BLM's confidential estimate of fair market value.[5]  43 CFR § 3422.3; Inspector General at 4.

In 23 of the 28 Powder River Basin coal lease sales conducted during the past 20 years, BLM has received only one bid; in the remaining five cases, BLM received two bids.  Hageman Decl. ¶ 10; *see also* Inspector General at 8; Pl. 56.1 ¶ 14.  In lease sales where there is only one bid, BLM's confidential estimate of fair market value, therefore, effectively supplies the sole price competition for the applicant.  *See* Inspector General at 8 ("The FMV determination is critical in coal leasing because a competitive market generally does not exist for coal leases, therefore, the FMV serves as a substitute for competition.").  There is a similar lack of competition in other states where BLM leases coal tracts.  Inspector General at 8.

GAO explains the paucity of competing bids as follows:

> *According to BLM and coal industry representatives, there is limited competition for coal leases because of the significant capital investment and time required to establish new supporting infrastructure to start a new mine or to extend operations of an existing mine to a tract that is not directly adjacent to it.*  For these reasons, there have not been many new mines established on federal leases recently.  For example, according to BLM officials the last new mine started on a federal lease in the Powder River Basin in Wyoming was the North Rochelle mine, which began operations in 1982. . . .  In 1983, we noted a similar lack of competition for federal

---

[5] If no bid meets BLM's estimate of fair market value, the tract may be reoffered for sale. GAO's recent review of 107 leased tracts nationwide found that 83% were leased the first time they were offered for sale, while 17% were leased after being reoffered one or more times.  GAO at 19; *see also* NARO North Appraisal Report (appraisal report for the reoffer of the NARO North lease).

coal leases following the 1982 regional coal lease sale in the Powder River Basin and concluded that the market for coal leasing was largely noncompetitive because lease tracts sold "appear captive to adjacent mining operations."  According to BLM officials, this same issue remains relevant today, and it is difficult to attract multiple bidders on a lease tract if it is not adjacent to multiple mining operations. For example . . . tracts submitted for lease-by-application that are north and west of the Black Thunder mine are less likely to be bid on by the operators of the [non-adjacent] North Antelope Rochelle or Antelope mines.  This is because it would be too costly and take significant time for these mine operators to move their heavy equipment to extract coal from these lease tracts, which are not directly adjacent to their existing operations.  In contrast, the lease tracts that are located between two mines are more likely to be bid on by multiple mine operators, according to BLM officials.[6]

GAO at 17–18 (emphasis added).

### D.  Determining Fair Market Value

BLM's Wyoming and Montana state offices use two methods to estimate fair market value: comparable sales and income.  *Id.* at 30.  Under the comparable sales approach, BLM estimates fair market value by taking prior sales as a benchmark and making adjustments based on characteristics of the tract at issue, *e.g.*, the quality of its coal.  *Id.* at 28–29.  Under the income approach, BLM estimates fair market value based on the net present value of the projected revenues from coal sales minus the extraction costs.  *Id.*

BLM estimates the fair market value of the coal lease in a document called an "appraisal report."  Pl. 56.1 ¶ 16.  The appraisal report, in turn, incorporates information from three other BLM-prepared reports: an economic report, an engineering report, and a geologic report.[7]  *Id.*; GAO at 8; Hageman Decl. ¶ 8.

---

[6]  In recognition of these geological impediments, BLM has sometimes modified tract boundaries to encourage multiple mine operators to submit bids.  GAO at 19.  Unfortunately, these efforts do not appear to have been successful.  GAO reviewed seven instances in which BLM had modified boundaries; in none did BLM ultimately receive multiple bids in the ensuing sales.  *Id.*

[7] In citing these reports, the Court refers to the Bates-stamped page numbers on these documents.

### 1.   The Appraisal Report

Because the appraisal report is at the heart of NRDC's FOIA request, the Court describes

it in detail.  The appraisal report begins with an introduction and a section entitled "Appraisal

Tract Data."  Together, these include data about the subject tract's location, current use, geology,

coal reserves and quality, and access to water and railroads; the characteristics of that portion of

the Powder River Basin and the demand for Powder River Basin coal; information on the

applicant mine and, as relevant, other adjacent mines, including their geology and coal

production; whether BLM expects bids from anyone other than the applicant; and the methods by

which the applicant proposes to remove and transport the coal and reclaim the land.  *See* NARO

North Appraisal Report at 14–27; West Antelope II North Appraisal Report at 12–28; West

Antelope II South Appraisal Report at 12–28.  In response to NRDC's FOIA request here, the

Government has moderately redacted this section in each appraisal report.

The next section, "General Valuation Analysis," describes how the report will estimate

fair market value.  This description appears to follow a standard template, which is tailored at the

end according to the particular circumstances of the subject tract.  BLM uses two main methods

to calculate fair market value, each of which has one variant.

The first main method, the discounted cash flow ("DCF") method, estimates the value of

the coal lease by projecting the annual after-tax revenues from future coal sales, minus the costs

of production, and discounting the net revenue, based on the time value of money, to arrive at the

current value of the coal tract.  In other words, DCF is a way of valuing an asset—here, a coal

tract—based on its expected future revenue stream.  *See* GAO at 28–29.  As BLM explains:

> This procedure provides a comprehensive estimate of the present value of a future
> income stream.  This is accomplished through discounting, which is the process of
> arithmetically reducing future income to its current value based on the time value
> of money and the compounding of interest.  The DCF takes into consideration many

> variables such as resource reserves, production rates, production timing, development and production costs, product selling price, taxes, discount rate, royalty rate, and economic production life.  The resulting estimate of present value gives an indication of the market value of the subject property.

NARO North Appraisal Report at 28.

The weakness of the DCF method is that it is only as good as the assumptions on which it is based.  As BLM notes: "[T]he large number of assumptions and estimates used in the DCF make it less than exact by nature.  For example, the estimated value is extremely sensitive to price and discount rates.  This means that small deviations in these variables can produce major differences in the after tax net present value."  *Id.*  In addition to using the DCF method to value the subject tract directly, BLM also uses the DCF method to perform an "incremental analysis," which "compare[s] the net present value of the existing [mining] operation both with the property and without the property."  *Id.*; *see also id.* at 32.

The second main method, Comparable Sales, takes prior sales as a benchmark and makes adjustments based on differences between the comparison tracts and the tract at issue.  *See* GAO at 28–29.  Were there enough data, regression analysis could be used to apply numeric weights to the relevant variables, such that adjustments between tracts could be made quantitatively.  *See* NARO North Appraisal Report at 29.  However, there are not enough coal lease sales to make regression analysis statistically reliable.  *Id.*  As a result, BLM instead uses a technique called "bracketing," "which analyzes available sales qualitatively and locates the subject values within a range established by previous sale prices."  *Id.*  BLM makes "objective adjustments for differences that can be quantified" and "subjectively compar[es] the remaining differences."  *Id.*  BLM acknowledges that, "[w]hile useful, the comparable sales approach, even with quantitative and qualitative adjustments, may not be able to give a definitive indication of value but only a general range of value for the subject."  *Id.* at 32.

BLM also uses a variant of the comparable sales method, called the DCF Adjusted Comparable Sales. *See, e.g.*, *id.* at 30 ("In order to minimize the inherent weakness in a straight DCF analysis caused by the large number of assumptions required, the DCF adjusted comparable sales approach is used whenever possible.").   BLM compares the DCF for a comparable sale with the DCF for the subject tract; on the basis of that comparison, it adjusts the sale price of the prior tract upward or downward to achieve an estimate of the fair market value of the subject tract.  *Id.*  For example, consider a comparable tract which sold for 25 cents per ton of coal and whose DCF was 30 cents per ton, and a subject tract whose DCF is 35 cents per ton.  BLM could then use that earlier sale, at a price of 25 cents per ton, as a benchmark, and add 5 cents per ton, based on the difference between the subtract tract's DCF and the comparable tract's DCF, yielding a DCF Adjusted Comparable Sales value for the subject tract of 30 cents per ton.[8]  *Id.* at 30–31.

In response to NRDC's FOIA request, the Government has moderately redacted the "General Evaluation Analysis" section of the appraisal reports.  As redacted, the available reports do not disclose how BLM melds these four methods—DCF, incremental DCF, Comparable Sales, and DCF Adjusted Comparable Sales—to arrive at a final estimate of fair market value.  *See* NARO North Appraisal Report at 32; West Antelope II North Appraisal Report at 33; West Antelope II South Appraisal Report at 33.

---

[8] BLM actually uses two different methods to adjust the prior sale: arithmetic and proportional. *Id.* at 30.  In the arithmetic method, BLM begins with the prior sale price, and adds to it, or subtracts from it, the difference between the subject tract DCF and the prior tract DCF.  *Id.*  In the proportional method, BLM begins with the prior sale price, and multiplies it by the ratio between the subject tract DCF and the prior tract DCF.  *Id.* at 31.  In certain circumstances, the choice of method will determine whether the resulting estimate is more influenced by the comparable sale price or the DCF.  *Id.*  Accordingly, BLM chooses which method to use depending on whether the comparable sale or DCF is considered to be the more reliable indicator of the value of the subject tract at hand.  *Id.*

The next section, "Comparable Sales," begins by explaining the bases on which coal lease sales were determined to be comparable to the subject tract.  In the NARO North Appraisal Report, the reasoning as to two potential comparable tracts is redacted; in the other two appraisal reports, none of the reasoning as to the choice of comparable tracts has been redacted.  *See* NARO North Appraisal Report at 32; West Antelope II North Appraisal Report at 34; West Antelope II South Appraisal Report at 34.

The section then describes, for each comparable sale, the tract's location and relationship to other mines; the tract's coal quality; the economics of the applicant mine; the timetable for mining; and the sale price.  *See, e.g.*, NARO North Appraisal Report at 33–48.  The latter three categories of information are heavily redacted.

The NARO North Appraisal Report considers 14 comparable sales; the West Antelope II North Appraisal Report considers 19 prior sales; and the West Antelope II South Appraisal Report considers 20 prior sales.  *See* NARO North Appraisal Report at 33; West Antelope II North Appraisal Report at 34; West Antelope II South Appraisal Report at 34.

The remainder of the appraisal report analyzes the value of the subject tract, in a series of sections entitled "Comparable Sales Analysis," "Economic Overview and Analysis," "Allocation of Value," "DCF Adjusted Comparable Sales Analysis," and "Summary and Conclusion."  These sections have been entirely redacted in response to NRDC's FOIA request.  *See* NARO North Appraisal Report at 49–68; West Antelope II North Appraisal Report at 56–75; West Antelope II South Appraisal Report at 57–76.  The report then concludes with a short section entitled "Final Estimate of Value," which is entirely redacted in one report, *see* NARO North Appraisal Report at 69, and the substance of which is redacted in the other two reports, *see* West Antelope II North Appraisal Report at 76; West Antelope II South Appraisal Report at 77.

### 2.   The Economic Report

"The economic report presents information used to prepare discounted cash flow models for the tract and results from the analysis of those models."  Hageman Decl. ¶ 8; *see also* GAO at 8 ("An economic report provides information on future coal market conditions, including price and demand levels for the lease tract's coal.").  The "Regional Economic Overview" section, which is moderately redacted, analyzes historical and expected demand, supply, prices, and costs.  NARO North Economic Report at 6–19; West Antelope II Economic Report at 5–25.  The remaining sections—"Lease Tract Economic Data," "Economic Valuation Procedure," "Economic Valuation Results," and the attachments—are entirely redacted.  NARO North Economic Report at 20–71; West Antelope II Economic Report at 26–58.  The reference list is also largely redacted.  NARO North Economic Report at 34; West Antelope II Economic Report at 38.

### 3.   The Geologic Report

"The geologic report estimates, describes, and documents the occurrences, reserves, and quality of the area of the tract and the adjacent mines and leases."  Hageman Decl. ¶ 8.  It "contains a legal description of the tract, along with an estimate of the amount of coal that can be recovered on the lease tract along with the characteristics of the coal, including its heating content."  GAO at 8.  The description and legal status of the land are minimally redacted, as is the short section on regional geology.  NARO North Geologic Report at 6–11; West Antelope II Geologic Report at 4–18 (albeit redacting all of the figures in the introductory section).  The list of "assumptions and parameters used to complete this geologic study" is entirely redacted, and the section on local coal geology is almost entirely redacted.  NARO North Geologic Report at 12–25; West Antelope II Geologic Report at 18–59.

### 4.  The Engineering Report

"The engineering report focuses on the mining methods and related costs for the adjacent mine to incorporate the subject into its existing reserve."  Hageman Decl. ¶ 8; *see also* GAO at 8 ("An engineering report generally contains a mining plan, along with estimates of the costs to extract the coal based on the number of employees and capital equipment necessary to carry out this plan, among other costs.").  The engineering report is "based on the geologic model," which "is used to develop a mine model."  NARO North Engineering Report at 7; West Antelope II Engineering Report at 5 (same).  The mining model is then used to model three scenarios.  *See* NARO North Engineering Report at 7; West Antelope II Engineering Report at 5.

Because the engineering reports are heavily redacted, the Court relies on their brief introductions to explain their contents.  For example, the West Antelope II Engineering Report explains:

> Following the completion of the mine model, an estimate of future production at the Antelope Mine was determined by considering REDACTED.  Based on these factors, REDACTED was determined to be the limiting factor to the overall production rate at the mine.

> For this evaluation, the scenarios analyzed were primarily based on REDACTED. The mine utilizes one railroad spur, one loadout facility, and two primary and secondary crushing locations.  Coal quality was maintained REDACTED for all scenarios.  In all three cases, the existing reserves are completed mined within the respective leases (Life of MINE (LOM) scenarios).

*See* West Antelope II Engineering Report at 5.  The NARO North Engineering Report is similar. *See* NARO North Engineering Report at 7.  The final part of the engineering report's analysis is the cost model.  *See* NARO North Engineering Report at 10; West Antelope II Engineering Report at 8.

After the brief introduction, what appears to be the body of each engineering report is entirely redacted.  *See* NARO North Engineering Report at 11–214; West Antelope II Engineering Report at 13–337.

### E.  The Instant Motions

On September 11, 2013, NRDC moved for summary judgment, Dkt. 11, and filed a memorandum of law in support, Dkt. 12 ("Pl. Br.").  On October 29, 2013, the Government filed an opposition and cross-motion for summary judgment, Dkt. 22; a memorandum of law in support, Dkt. 23 ("Def. Br."); and revised Vaughn Indices, Dkt. 26 ("Poscablo Decl."), Ex. A ("NARO North Vaughn Index"), Ex. B ("West Antelope II Vaughn Index"), Ex. C ("Computer Model Vaughn Index").  On November 26, 2013, NRDC moved for discovery in the alternative under Rule 56(d), Dkt. 32, and filed a memorandum of law in support of that motion, in reply in support of its original motion for summary judgment, and in opposition to the Government's cross-motion for summary judgment, Dkt. 33 ("Pl. Reply Br.").  On December 20, 2013, the Government filed a reply in support of its cross-motion for summary judgment and in opposition to NRDC's motions.  Dkt. 39 ("Def. Reply Br.").  On January 15, 2014, NRDC filed a reply in support of its motion, in the alternative, for discovery.  Dkt. 46 ("Pl. Discovery Reply Br.").  On February 7, 2014, the Court heard argument.  Dkt. 54 ("Tr.").

## II.     Applicable Legal Standards

Public access to information held by the federal government is governed by FOIA.  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted).  However, "Congress realized that legitimate governmental and private interests could be harmed

by release of certain types of information, and therefore provided the specific exemptions under which disclosure could be refused." *Id.* (citation omitted). "Recognizing past abuses, Congress sought to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *Id.* (citation omitted).

"FOIA thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1262 (2011). "These exemptions are explicitly made exclusive, and must be narrowly construed." *Id.* (citations omitted). "The agency asserting the exemption bears the burden of proof, and all doubts as to the applicability of the exemption must be resolved in favor of disclosure." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009). Courts review the adequacy of the agency's justifications *de novo*. *Id.*

"'Summary judgment is the procedural vehicle by which most FOIA actions are resolved.'" *New York Times Co. v. U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007) (quoting *Jones-Edwards v. Appeal Bd. of NSA*, 352 F. Supp. 2d 420, 423 (S.D.N.Y. 2005)). "An agency that has withheld responsive documents pursuant to a FOIA exemption can carry its burden to prove the applicability of the claimed exemption by affidavit." *Wilner*, 592 F.3d at 73. "'Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith. Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible.'" *Id.* (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

"'Summary judgment in favor of the FOIA plaintiff' is appropriate 'when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." *New York Times*, 499 F. Supp. 2d at 509 (quoting *Petroleum Info. Corp. v. United States Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992)).

"Affidavits submitted by an agency are accorded a presumption of good faith; accordingly, discovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face." *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (citation omitted). "In order to justify discovery once the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations, or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate." *Id.* (citations omitted)

## III.  Discussion

The Government argues that FOIA Exemptions 4, 5, and 9 apply to the requested materials.  The Government has invoked Exemption 5 in support of each of its redactions; in support of some, it has also invoked Exemption 4 and/or Exemption 9.  *See* NARO North Vaughn Index; West Antelope II Vaughn Index.  Below, the Court addresses the Government's invocation of Exemptions 4, 5, and 9 in turn.

### A.  Exemption 4

Exemption 4 protects "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  "For Exemption 4 to apply, (1) the information must be a 'trade secret' or 'commercial or financial' in character; (2) must be 'obtained from a person,' and (3) must be 'privileged or confidential.'"  *Inner City Press/Cmty.*

17

*on the Move v. Bd. of Governors of Fed. Reserve Sys.*, 463 F.3d 239, 244 (2d Cir. 2006) (quoting 5 U.S.C. § 552(b)(4)) (other citations omitted).

BLM has invoked Exemption 4 to redact information, submitted by the mining companies and incorporated into BLM's reports, concerning the applicant mine and the subject tract. Def. Br. 10–11. This information, which BLM asserts is confidential, includes, for example, (1) the quantity and quality of available coal in the area of the subject tract, (2) geologic constraints on recovering that coal, (3) the quantity and quality of coal produced by the applicant mine, (4) operational and cost data pertaining to the applicant mine, and (5) current and prospective markets for coal produced at the mines. Def. Br. 11.

NRDC argues that the Government should be required to disclose this information, because (1) the Mineral Leasing Act authorizes the Government to disclose it; (2) the information in fact consists of the government's own analyses, and therefore was not "obtained from a person"; and (3) the information is not "confidential" within the meaning of FOIA. The Court addresses these arguments in turn.

### 1. The Effect of the Mineral Leasing Act

NRDC first argues that Exemption 4 does not apply because "the Government's Regulations and the Mineral Leasing Act specifically provide that the withheld information can be released." Pl. Br. 10. The Mineral Leasing Act requires an exploration licensee to provide the government with "all data . . . obtained during such exploration." 30 U.S.C. § 201(b)(3). It also provides that "[t]he Secretary shall maintain the confidentiality of all data so obtained until after the areas involved have been leased or until such time as he determines that making the data available to the public would not damage the competitive position of the licensee, whichever comes first." *Id.*; *see also* 43 C.F.R. § 3410.4 (similar); 43 C.F.R. Pt. 2, App. B(c)(1) (similar).

NRDC argues that, under these provisions, the Government can publicize exploration data that was submitted as part of the coal leasing process, if, as with the instant FOIA request, the subject tracts have been leased; at that point, according to NRDC, the information no longer needs to be kept confidential.  Pl. Br. 10–11.

For two independent reasons, these provisions do not undermine the Government's invocation here of Exemption 4.  First, the Mineral Leasing Act and its implementing regulations do not require the Government to release exploration data.  They do not provide that, upon the occurrence of a given condition, the Secretary *shall* publish exploration data.  Instead, they are addressed to an explorer's right to have its data kept confidential, and merely *permit* the Government to disclose the information when it deems appropriate.  *See* 30 U.S.C. § 201(b)(3) ("The Secretary shall maintain the confidentiality of all data so obtained . . .").  The provisions also do not purport to bear on, or limit the scope of, Exemption 4.

Second, the Government has submitted a sworn declaration stating, as a factual matter, that none of the redacted information was based on drilling conducted by a mining company under an exploration license.  Dkt. 41 ("Hageman Supp. Decl.") ¶ 9.  The Court has been given no reason to disbelieve that declaration.  Thus, even if the Mineral Leasing Act and the cited regulations compelled, as opposed to permitted, the disclosure of exploration data, such data is not implicated here.[9]

---

[9] In emphasizing the ability of the Government to make exploration data public, NRDC implies, although it does not explicitly argue, that the public domain exception to Exemption 4 may apply here.  *See* Pl. Br. 10–11; Pl. Reply Br. 8; *Inner City Press*, 463 F.3d at 244 ("Although confidential commercial information is not subject to disclosure under Exemption 4, the exemption does not apply if identical information is otherwise in the public domain.").  However, NRDC has not shown, as required for the exception to apply, that the information at issue is actually in the public domain.  Instead, it has shown only that the Government *could* lawfully place it in the public domain.  *See id.* ("The Supreme Court has limited the public domain exception to information that is 'freely available.'") (quoting *U.S. Dep't of Justice v.*

## 2.  Whether the Information was "Obtained from a Person"

Exemption 4 applies to, and shields, only information that is not "generated within the Government." *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 148 (2d Cir. 2010) (citation omitted).  Textually, that is because Exemption 4 applies to information that is "obtained from a person," 5 U.S.C. § 552(b)(4), and FOIA's definition of persons does not include government agencies, *see id.* § 551(2).  Exemption 4 thus aims to shield outside entities'—as opposed to the Government's—confidential commercial and financial information from disclosure.  An entity seeking to block disclosure of proprietary governmental information must therefore look elsewhere (*e.g.*, Exemption 5).

Consistent with this purpose, "portions of agency-created records may be exempt if they contain information that was either supplied by a person outside the government or that could permit others to 'extrapolate' such information." *S. Alliance for Clean Energy v. U.S. Dep't of Energy*, 853 F. Supp. 2d 60, 67 (D.D.C. 2012) (citing *Gulf & W. Indus. v. U.S.*, 615 F.2d 527, 529–30 (D.C. Cir. 1979).  However, for Exemption 4 to apply, it is not enough to note that governmental analysis, at some level, was based on data provided by an outside "person."  *See Philadelphia Newspapers, Inc. v. Dep't of Health & Human Servs.*, 69 F. Supp. 2d 63, 67 (D.D.C. 1999) ("An audit is not simply a summary or reformulation of information supplied by a source outside the government.  It also involves analysis, and the analysis was prepared by the government.  The HHS charts were not 'obtained from a person,' and they may not be withheld

---

*Reporters Comm. For Freedom of Press*, 489 U.S. 749, 764 (1989)); *id.* at 249 ("To satisfy the burden of production, the requesting party must point to specific information in the public domain that appears to duplicate that being withheld.  A requesting party can fulfill this burden by pointing to a regulation that requires the disclosure of the specific information sought.") (citations omitted).

under Exemption 4.").  "[T]he key distinction—which will obviously be blurry in many instances—is between information that is either repeated verbatim or slightly modified by the agency, and information that is substantially reformulated by the agency, such that it is no longer a person's information but the agency's information."  *S. Alliance for Clean Energy*, 853 F. Supp. 2d at 68.  Exemption 4 shelters only the former.

Here, NRDC argues that the information the Government has withheld under Exemption 4 is the Government's own analysis, not data from an outside "person," and is therefore outside of Exemption 4.  Pl. Br. 13; Pl. Reply Br. 4–7.  As NRDC notes, each Vaughn Index entry for information withheld under Exemption 4 describes that information as "BLM interpretation and analysis" or "BLM selection, interpretation, and analysis" of data submitted by the applicant mining company.  *See* NARO North Vaughn Index at 4, 6–9; West Antelope II Vaughn Index at 4, 7, 9–11.  The Government has separately withheld the same portions of the reports under Exemption 5's government commercial privilege exemption, which "is necessarily confined to information generated by the Federal Government itself."  *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 360 (1979).  NRDC argues that, to the extent that these portions of the reports constitute BLM's own analysis, they cannot be withheld under Exemption 4.

NRDC's argument is an understandable reaction to the sparse Vaughn Indices submitted by the Government.  For each entry, these provide a single-sentence explanation that collectively invokes multiple exemptions, including Exemptions 4 and 5.  *See, e.g.*, NARO North Vaughn Index at 7 (stating that a list of figures in the NARO Geologic Report was partially withheld under Exemptions 4, 5, and 9, because it contained "[p]roprietary and confidential BLM

21

interpretation and analysis of geologic quality and structure based on proprietary and confidential information submitted by applicant, including from private drill holes.").

However, the Government later submitted a Supplemental Declaration from Steven Hageman, the long-time Minerals Appraiser for BLM's Wyoming State Office.  Hageman therein clarifies the basis for the Government's invocation of Exemption 4.  Hageman explains that "BLM withheld under Exemption 4 only information it has received from mining companies in response to BLM's requests for information in connection with LBAs."  Hageman Supp. Decl. ¶ 5.  For example, BLM redacted data from coal sales contracts and post-lease drilling. *Id.* ¶¶ 7– 8.  In other words, BLM invoked Exemption 4 to withhold mining company data underlying its analysis, but it did not invoke Exemption 4 to withhold BLM's analysis itself.  For that, BLM invoked Exemption 5.

Hageman's declaration is "accorded a presumption of good faith," *Carney*, 19 F.3d at 812.  And NRDC has given the Court no non-speculative reason to doubt his representations, other than to point out the government's unhelpful practice of collectively referencing multiple exemptions in the Vaughn Indices, a situation which Hageman's supplemental declaration has since rectified.  And NRDC has conceded that "raw company data put in a report or a slight repackaging of it" can be withheld under Exemption 4.  Tr. 9.

NRDC, finally, faults the Government's Vaughn Indices for not stating, as to each withheld piece of information, which mining company the information came from.  Pl. Discovery Reply Br. 6.  NRDC, therefore, asks for discovery into this point.  But there is no need for such discovery, because the data pertains, in each case, to a particular mine or mines, and as such is readily traceable to the company that operates those mine or mines.

### 3.  Confidentiality

The Court considers, finally, whether the withheld information is "confidential" within the meaning of Exemption 4.  For such inquiries, "this Circuit has adopted a two-part test formulated by the District of Columbia Circuit in *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974)."  *Inner City Press*, 463 F.3d at 244.  Under that test, "information is confidential for the purposes of Exemption 4 if its disclosure would have the effect either: '(1) of impairing the government's ability to obtain information—necessary information—in the future, or (2) of causing substantial harm to the competitive position of the person from whom the information was obtained.'"  *Id.* (quoting *Cont'l Stock Transfer & Trust Co. v. S.E.C.*, 566 F.2d 373, 374 (2d Cir. 1977)).

To meet that standard, it is not enough for a corporation to state that it "would prefer that [its] information be kept confidential."  *Lee v. F.D.I.C.*, 923 F. Supp. 451, 453 (S.D.N.Y. 1996).  The burden instead is on the Government to provide "adequate documentation of the specific, credible, and likely reasons why disclosure of the document would actually cause substantial competitive injury."  *Id.*  "[C]onclusory assertions of privilege will not suffice to carry the Government's burden of proof."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980) (Wald, J.).

Here, the Government asserts that requiring it to disclose the information withheld under Exemption 4 would (1) harm the competitive position of the mining companies and (2) impair the Government's ability, in the future, to obtain necessary information from them.  Def. Br. 12. In support of these claims, the Government has submitted declarations from executives at five

23

mining companies.[10]  *See* Dkt. 27 ("Lepchitz Decl."); Dkt. 28 ("Finnerty Decl."); Dkt. 29 ("Clark

Decl."); Dkt. 30 ("Nimmo Decl."); Dkt. 31 ("Durgin Decl.").   The Court considers these claims

in turn.

### a. *Competitive Harm*

In support of its claim that disclosure would harm the mining companies, the Government

makes three arguments.  All are to the effect that requiring disclosure of the mining companies'

information would provide their competitors and/or customers with valuable insights into their

operations and costs.  Specifically, the Government argues that: (1) competitors could underbid

each other in purchasing coal leases; (2) competitors could underbid each other in selling coal;

and (3) customers could drive a harder bargain in purchasing coal.  *See* Def. Br. 12–14; Def.

Reply Br. 9–11.

The first argument is unpersuasive.  Based on the record before the Court, mining

companies do not meaningfully compete for coal leases from BLM.  To establish competitive

harm, the Government must show that "the person who submitted the information faces both (1)

---

[10] As a threshold matter, NRDC argues that, for two reasons, the Court should not consider these declarations.  NRDC argues that the declarations are irrelevant because they "address solely information the companies submitted to BLM," not the Government's own analysis, which is how NRDC characterizes the information withheld under Exemption 4.  *See* Pl. Reply Br. 8–9. It also argues that the declarations are not based on personal knowledge of the withheld material, because the Government has not publicly disclosed its appraisal analysis, and so the corporate declarants cannot have known their contents.  *Id.* at 9.

These objections are unpersuasive.  As to the first, the Government has represented, in the supplemental Hageman Declaration, that the information withheld under Exemption 4 consists of data submitted by the mining companies.  *See* Hageman Supp. Decl. ¶ 5.  As to the second, the declarants have stated their views as to the consequences of releasing mine-specific data, as described in the Vaughn Index and the supplemental Hageman Declaration.  As such, the declarations are relevant and based on personal knowledge, even if the declarants did not know, but can only infer, the specific pieces of the data they submitted that the Government seeks to shield by invoking Exemption 4.  The Court is accordingly at liberty to consider the declarations.

actual competition and (2) a likelihood of 'substantial' competitive injury if the information were released." *Inner City Press v. Bd. of Governors*, 380 F. Supp. 2d 211, 219 (S.D.N.Y. 2005) (Cote, J.), *aff'd* 463 F.3d 239 (2d Cir. 2006); *accord McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1198 (D.C. Cir. 2004) ("[T]he threshold requirement of our *National Parks* test [is] that the contractor must 'actually face competition.'") (quoting *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 679 (D.C. Cir. 1976)).

Here, the record reflects that "a competitive market generally does not exist for coal leases." Inspector General at 8. As the Government's declaration itself acknowledges, "the applicant is usually the only bidder, since other companies would not be able to efficiently use coal reserves adjacent to another company's mine." Hageman Decl. ¶ 20; *accord* GAO at 17. Indeed, in fully 82% of Powder River Basin coal lease sales during the last 20 years, BLM has received a single bid. *See* Hageman Decl. ¶ 10. This lack of competition, is, in fact, the fulcrum of the Government's invocation of Exemption 5, in which it seeks to withhold its methodology for determining fair market value, on the ground that the Government's internal calculation of fair market value, rather than a competing bid, is in fact the benchmark that a bidding mining company must exceed. *See* Def. Reply Br. 13 (the fair market value estimate "is often the applicant's only competition").

At argument, therefore, the Government rightly conceded that there is no substantial concern about mining companies using the information withheld under Exemption 4 to outbid one another for coal leases. Tr. 22 ("THE COURT: If I understand you right, there isn't a real concern here about another mine coming in and outbidding the company for a lease, because that really is a function of who the neighbor is. The concern is an end user purchaser might drive a harder bargain? MS. POSCABLO: Right. In those, there are some situations, very few, but

where there are two mine companies who bid for the same tract where the tract happens to be near two mines, but that's rare.  The concern more is with the competition in selling coal.").

The coal companies nevertheless argue to the contrary, *i.e.*, they claim that there is such competitive harm.  But their submissions are conclusory.  They are unsupported by either data or coherent explanations to why such harm would ensue.  *See* Lepchitz Decl. ¶ 10 ("These named competitors compete with Alpha PRB for coal supply agreements and coal leases."); Durgin Decl. ¶ 9 ("These named competitors compete with Peabody for coal supply agreements and coal leases."); Finnerty Decl. ¶ 9 ("The confidentiality of this information is especially important in the Southern Powder River Basin, where there has been vigorous competitive bidding for LBAs."); Clark Decl. ¶ 4 ("Antelope and Cordero compete with a number of other coal producers in the Powder River Basin [ ] to provide high-quality, low sulphur coal to customers."); Nimmo Decl. ¶ 6 ("A number of companies operate mines in the PRB which compete with Buckskin for the sale of PRB coal.").  Given the above-cited evidence and the Government's candid admissions, the companies' unsubstantiated assertions lack persuasive force.  These conclusory assertions do not give rise to an issue of material fact that would preclude summary judgment.  *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 319 (2d Cir. 2008) ("Conclusory statements, conjecture, and speculation are insufficient to create a genuine factual dispute.").  The Court therefore rejects the Government's first theory of competitive harm.

The Government's two remaining arguments may be treated together.  These are that, if the mining companies' information were disclosed, competitors, and customers, would learn or be able to infer their operating costs at the mines at issue.  This, the Government posits, would enable competitors to undercut the companies when selling coal, and enable customers to drive a

26

harder bargain when buying it.  But these arguments are put at a highly conceptual, imprecise level.  *See* Def. Br. 13 (claiming that disclosure would allow competitors and customers to "more accurately predict the company's cost of operations"); Def. Reply Br. 9 (claiming that disclosure would allow competitors and customers to gain "insights into their operations and costs").  The coal companies' declarations do not fill in the necessary detail:  None concretely illustrates why disclosure would, in practice, work such harm.  The most fulsome explanation given is this:  That "if competitors knew what Buckskin's cost of mining were, how it operates its mines, its mining plans, or the price at which it sells coal under other contracts, Buckskin's competitors could use that information to 'underbid' Buckskin in future coal sale contracts."  Nimmo Decl. ¶ 8.

These assertions are altogether too blurry and unsubstantiated to meet the Government's burden of establishing competitive harm.  To begin with, historical mine-cost data does not logically bear on the price at which the mining company would seek to sell coal that is already on hand, *i.e.*, that has already been mined.  Once a seller has coal on hand, its sunk costs are presumably less relevant to its price-setting than maximizing revenue from the sale of such coal.

At most, such data (viewed in combination with other information) might be relevant to future mining plans.  It might help a competitor draw a conclusion as to a floor price beyond which—assuming past conditions persisted—it might be uneconomical for the mining company to continue to mine coal at a particular site.  But knowing a mine's historical operating costs as reflected in its bidding submissions is a woefully incomplete basis on which a competitor or customer could predict the price at which the company that leased that particular mine would be willing to sell its coal.

Despite NRDC's pursuit of the point, the Government does not anywhere explain concretely how access to the mining companies' bidding information would be useful to a competitor in setting prices or to customers in negotiating.  The information concerning operating costs or coal pricing largely comes from mines that were leased years ago.  It is unclear why competitors or customers would rely on such old data, which at most provides thin circumstantial evidence as to how, today and in the near future, the company at issue might seek or be willing to price its coal.

Significantly, cost or production estimates made at the time of an application to lease a mine may be overtaken by events.  *See* Forsyth Decl. Ex. P (entitled *BLM Manual H-3070-1, Economic Evaluation of Coal Properties*) at III–14 ("Uncertainty in produced coal price and capital and operating costs affect the property's income stream."); *id.* at III–21 ("[T]here is uncertainty in the market potential for the coal under lease.  This uncertainty affects estimates of future coal prices and the timing of coal production.  There is uncertainty in mining costs that affect the income stream from which value is estimated."); *Lee*, 923 F. Supp. at 455 (stating, in 1996, that "the financial information in question is given for the 1994 year and any potential detriment which could be caused by its disclosure would seem likely to have mitigated with the passage of time").  And although some factors may remain constant, such as coal quality in the area, hindrances to mining, equipment on site, and transportation costs, *see* Tr. 22, at least some of these, such as the presence of large-scale equipment and the availability of transportation routes, are also likely to be known already to competitors or readily discoverable by them without FOIA disclosure.

Further, as NRDC notes, current market prices for coal are already publicly available. *See, e.g.*, U.S. Energy Information Administration, "Coal News and Markets,"

http://www.eia.gov/coal/news_markets, and "Coal News and Markets Archive,"

http://www.eia.gov/coal/news_markets/archive/ (showing average weekly coal spot prices for

five regions in the United States, including the Powder River Basin, from July 2008 to the

present). A coal company seeking to underbid another company, or a customer seeking to drive

a hard bargain, would probably be better advised to look to market prices than to try to reverse-

engineer a different company's future price intentions based on aspects of operating costs drawn

from a particular mine from years prior.

Importantly, the Government has also not concretely explained the competitive dynamics

by which the revelation of information as to costs in the Powder River Basin area would put it at

a competitive disadvantage against other mining companies. It is, for example, unclear

concretely against whom mining operators in that distinct area compete with respect to the sale

of coal. To the extent that the competitors are other operators in the same area, the Government

has not established that (1) these operators are not, already, broadly familiar with the peculiar

efficiencies, inefficiencies, and challenges presented by mining in that area, or (2) any operator

would be competitively disadvantaged by a disclosure ruling that would apply equally to all

Powder River Basin operators. To be sure, a Powder River Basin mining company might, at a

general level, have a competitive disadvantage against companies operating elsewhere were its

cost structure revealed. But the Government has not put forward solid evidence that Powder

River Basin coal substantially competes with coal produced from other areas, let alone a reliable

basis on which to assume that the data revealed would in fact disturb the competitive dynamics

of the market.

On the record before it, the Court can only uneasily speculate whether, and to what

degree and in what circumstances, true competition exists between Powder River Basin coal and

other coal.  The record reflects that Powder River Basin coal is attractive both because of its

relatively low cost and because it has less sulfur than coal from the eastern United States, which

enables utilities to meet emissions limits under the Clean Air Act.  *See* GAO at 20; *see also* U.S.

Energy Information Administration, "Coal News and Markets,"

http://www.eia.gov/coal/news_markets (for week ending August 1, 2014, spot price for Powder

River Basin coal was $12.25 per short ton, compared to between $36.45 and $63.70 per short ton

for coal from other regions).  This may indicate that, although buyers are probably willing to use

coal from other regions instead of Powder River Basin coal, the two are not complete substitutes,

such that the competition between the two is, to some extent, buffered.  And a buyer considering

dropping Powder River Basin coal in favor of coal from another venue would, presumably, have

to take account of a variety of factors, including price, energy content, and sulfur dioxide levels,

not to mention differential transportation costs and other location-specific costs.  The record at

hand, however, little illuminates the extent to which coal mined from the Powder River Basin

competes, or under changed circumstances might compete, with coal mined elsewhere.

      In sum, the Court is constrained to conclude that the Government, as to its claim that

disclosure could enable competitors to underbid one another in selling coal or customers to drive

a hard bargain in buying it, has not met its burden to provide "adequate documentation of the

specific, credible, and likely reasons why disclosure of the document would actually cause

substantial competitive injury."  *Lee*, 923 F. Supp. at 455.  With only conclusory claims before it,

the Court is unpersuaded by the assertion that Powder River Basin mining companies would be

put at a significant competitive disadvantage against other mining companies, with whom they

are in limited if any competition for the sites at issue, by the disclosure of dated operational cost

information.

b. *The Government's Ability to Acquire Information*

The Government alternatively argues that, if forced to disclose the information that the mining companies voluntarily provide in order to assist the Government in estimating fair market value, the companies would cease to divulge that information in the future.  Def. Br. 13.  The Government's only support for this argument, however, are citations to conclusory statements in the mining executives' declarations, in which they aver that they would be reluctant to provide this information in the future if they knew it would be made public.  *Id.* (citing Lepchitz Decl. ¶ 11; Clark Decl. ¶ 8; Nimmo Decl. ¶ 11).

Such conclusory statements are insufficient to meet the Government's burden under Exemption 4.  Otherwise, the Exemption's requirement of objective confidentiality would be vitiated and replaced by a paltry requirement of subjective confidentiality, under which a private party that wished to withhold its information need only submit a declaration stating that an order compelling disclosure might lead it no longer to supply such information.  *See New York Pub. Interest Research Grp. v. U.S. E.P.A.*, 249 F. Supp. 2d 327, 336 (S.D.N.Y. 2003) ("[G]iving conclusive status to that which the submitter characterizes as confidential would cause the definition of 'confidential' to become overly broad, and thus undermine the central purpose of FOIA.").

Further, as NRDC notes, regardless of whether their bidding materials are disclosed, the mining companies have a strong incentive to provide the BLM with information about their mines, so as to enable them to lease coal tracts.  Pl. Reply Br. 14; *see also New York Pub. Interest Research Grp.*, 249 F. Supp. 2d at 336 ("A voluntary submitter may have sufficient external incentives to ensure continued government access to the desired information despite the prospect of public disclosure.").  The Government denies that there is such an incentive.  It

argues that the coal companies would still receive the leases, which "will proceed regardless of whether the companies submit the information; the FMV estimates would just be less accurate." Def. Reply Br. 11.  But this claim is in tension with BLM's statutory mandate.  The Mineral Leasing Act requires BLM not to sell coal for less than fair market value.  30 U.S.C. § 201(a)(1).  And BLM has represented in this litigation that the mining companies' information is critical to its assessment of fair market value.  BLM has no business leasing coal tracts if it does not have sufficient data in hand on which to reasonably estimate fair market value.  BLM's notion that the mining companies, like the proverbial little boy who takes his ball and goes home when he does not get his way, will cease to bid for Powder River Basin leases, is unsubstantiated and unlikely.

The Government, therefore, has not met its burden of showing that the information it has withheld under Exemption 4 is confidential.  Accordingly, the Court grants summary judgment to NRDC as to Exemption 4.

### B.  Exemption 5

Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Exemption 5 therefore "encompasses traditional discovery privileges."  *Wood v. F.B.I.*, 432 F.3d 78, 83 (2d Cir. 2005) (Sotomayor, J.) (citing *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)).  In *Federal Open Market Committee of the Federal Reserve System v. Merrill*, the Supreme Court held that Exemption 5 embodies "a qualified privilege for confidential commercial information."  443 U.S. 340, 360 (1979).  The privilege thus exists, in part, to prevent the Government from being "placed at a competitive disadvantage."  *Id.*

32

Here, the Government invokes Exemption 5's confidential commercial information privilege to withhold (1) certain information and analysis from each the four types of reports (economic, engineering, geologic, and appraisal) that BLM prepares as part of the fair market evaluation process; (2) the resulting fair market value estimates for coal tracts; and (3) the computer models it uses to estimate fair market value.  Gov. Br. 17–18; *see also* Gov. Reply Br. 13 (summarizing in greater detail the material withheld from the reports); NARO North Vaughn Index; West Antelope II Vaughn Index.  The Government explains that release of this information would place it at a competitive disadvantage vis-à-vis the coal companies because the coal companies could use the resulting insight into BLM's method of calculating fair market value to lower their bids.  Steven Hageman, the longtime Mineral Appraiser for BLM Wyoming, explains:

> Because BLM is continually appraising tracts in the same general area and BLM's FMV estimate is often the applicant's only competition, BLM uses both the most recent and the most comparable previous LBA sales in its FMV evaluation process—through direct comparison in the comparable sales approach to value and through a comparison of relative discounted cash flow values in the income approach to value.  Additionally, BLM has used the same approach to value since the LBA process began in 1990.  If FMV estimates and valuation methodology from completed sales were revealed, the mine companies would gain critical insight into the Government's bargaining position and reduce their bids accordingly, thereby compromising BLM's ability to obtain bids above BLM's estimated minimum acceptable bid and resulting in the potential loss of significant public revenue.

Hageman Decl. ¶ 22.

NRDC challenges the invocation of Exemption 5.  It argues that, under *Merrill* and its progeny, the commercial information privilege ceases to be available once the transaction at issue is finalized.  There is language in *Merrill* that, at first blush, supports NRDC's argument. *See Merrill*, 443 U.S. at 360 ("The theory behind a privilege for confidential commercial information generated in the process of awarding a contract, however, is not that the flow of

advice may be hampered, but that the Government will be placed at a competitive disadvantage or that the consummation of the contract may be endangered. Consequently, the rationale for protecting such information expires as soon as the contract is awarded or the offer withdrawn."). But *Merrill* arose in a different context. It involved information that was solely of retrospective relevance, and there was no claim, as here, that the disclosure of historical bidding metrics with regard to the leasing of Government property would impair the Government's future commercial interests. And *Merrill* did not categorically hold that, as a matter of law, the commercial information privilege can *never* apply to government-generated information generated in the course of the process of awarding a contract after that contract has been awarded. It had no occasion to address that issue. Nor has any case following *Merrill* done so.

The Court's analysis of whether Exemption 5 can be invoked here begins with a close analysis of *Merrill*. In *Merrill*, a law student who wished to study the Federal Reserve Open Market Committee ("FOMC" or "Committee") challenged the Committee's practice of delaying, for one month, the publication of its monthly Domestic Policy Directive (the "Directive"). *Id.* at 347. The Directive embodies the FOMC's principal conclusions from its monthly meeting, at which it "review[s] the overall state of the economy and consider[s] the appropriate course of monetary and open market policy." *Id.* at 344. It "summarizes the economic and monetary background of the FOMC's deliberations and indicates in general terms whether the Committee wishes to follow an expansionary, deflationary, or unchanged monetary policy in the period ahead." *Id.* It is then used to guide the Federal Reserve's day-to-day open market operations, *i.e.*, "the purchase and sale of Government securities in the domestic securities market," which is "the most important monetary policy instrument of the Federal Reserve System." *Id.* at 343–45. Each month, the FOMC creates a new Directive and publishes the previous month's Directive,

which is no longer operative.  *Id.* at 346–47.  The FOMC invoked Exemption 5 to support this policy of delayed release.  It argued that immediate release of the directive would "seriously disrupt the conduct of open market operations."  *Id.* at 350.

Because the Directives constitute "inter-agency or intra-agency memorandums or letters," thereby fulfilling the first requirement of Exemption 5, *Merrill* turned on the second requirement of Exemption 5:  whether the Directives "would not be available by law to a party . . . in litigation with the agency," 5 U.S.C. § 552(b)(5).  *See Merrill*, 443 U.S. at 352–53.  The Supreme Court noted that the relevant House Report "state[d] that Exemption 5 was intended to allow an agency to withhold intra-agency memoranda which would not 'routinely be disclosed to a private party through the discovery process in litigation with the agency.'"  *Merrill*, 443 U.S. at 353 (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess., 10 (1966)).  On this basis, the Court had previously recognized that Exemption 5 shielded "agency reports and working papers subject to the 'executive' privilege for predecisional deliberations" and "privileged attorney's work product."  *Id.* (citing *EPA v. Mink*, 410 U.S. 73, 86–87 (1973) and *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154–55 (1975)).

The Supreme Court in *Merrill* rejected the FOMC's principal argument that "Exemption 5 confers general authority upon an agency to delay disclosure of intra-agency memoranda that would undermine the effectiveness of the agency's policy if released immediately."  *Id.*  The Court reasoned that, because that asserted authority did not "rest[ ] on a privilege enjoyed by the Government in the civil discovery context," it was "fundamentally at odds with the plain language of the statute."  *Id.* at 353–54.  The asserted authority, the Court held, would also sweep too far and "run counter to Congress' repeated rejection of any interpretation of the FOIA which

would allow an agency to withhold information on the basis of some vague 'public interest' standard." *Id.* at 354.

FOMC's second argument for delayed disclosure of the Directives was based on Exemption 5's incorporation of existing civil discovery privileges. Federal Rule of Civil Procedure 26(c)(7) then provided that a district court, "for good cause shown," may order "that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way."[11]  *Id.* at 355–56.  The FOMC argued that each Directive constituted such commercial information during the month when it was operative, such that it would therefore be privileged from civil discovery during this period.  *Id.* at 356.

Considering this argument, the Court in *Merrill* noted that "[t]he federal courts have long recognized a qualified evidentiary privilege for trade secrets and other confidential commercial information," and that the Federal Rules of Civil Procedure provide similar protection in the civil discovery context, including to the United States when it is a party.  *Id.* at 356–57.  To assess whether this justified delayed disclosure of the Directives under FOIA, the Court then examined FOIA's legislative history.  FOIA's original draft did not include the version of Exemption 5 that was eventually enacted.  *Id.* at 357.  This prompted complaints from federal agencies:

> For example, the Department of Defense expressed concern that information relating to the purchase or sale of real estate, materials, or other property might not be protected; the General Services Administration stressed the need to avoid early disclosure of information that might prejudice the Government's bargaining position in business transactions; and the Post Office Department urged that in matters such as the negotiation of contracts, it should stand on the same footing as a private party. Included among those expressing such criticism was the Acting General Counsel of the Department of the Treasury, who specifically referred to the Department's concern about premature disclosure of information concerning Federal Reserve open market operations.

---

[11] That language, within minor alternations, is now contained in Rule 26(c)(1)(G).

*Id.* at 358 (citations omitted).  In response, "Congress amended the provision that ultimately became Exemption 5 to provide for nondisclosure of materials that 'would not be available by law to a party . . . in litigation with the agency.'"  *Id.* at 359 (citation omitted).  The House Report explained:

> [A] Government agency cannot always operate effectively if it is required to disclose documents or information which it has received or generated *before it completes the process of awarding a contract* or issuing an order, decision or regulation. This clause is intended to exempt from disclosure this and other information and records wherever necessary without, at the same time, permitting indiscriminate administrative secrecy.

*Id.* (emphasis added in *Merrill*) (citation omitted).

Based on this language, the Supreme Court inferred that the House Report, "in referring to 'information . . . generated [in] the process of awarding a contract,' specifically contemplated a limited privilege for confidential commercial information pertaining to such contracts."  *Id.* at 359.  In language whose significance the parties spar over here, the Court stated:

> This conclusion is reinforced by consideration of the differences between commercial information generated in the process of awarding a contract, and the type of material protected by executive privilege.  The purpose of the privilege for predecisional deliberations is to insure that a decisionmaker will receive the unimpeded advice of his associates. The theory is that if advice is revealed, associates may be reluctant to be candid and frank. It follows that documents shielded by executive privilege remain privileged even after the decision to which they pertain may have been effected, since disclosure at any time could inhibit the free flow of advice, including analysis, reports, and expression of opinion within the agency. *The theory behind a privilege for confidential commercial information generated in the process of awarding a contract, however, is not that the flow of advice may be hampered, but that the Government will be placed at a competitive disadvantage or that the consummation of the contract may be endangered. Consequently, the rationale for protecting such information expires as soon as the contract is awarded or the offer withdrawn*.

*Id.* at 359–60 (emphasis added).

The Court therefore concluded that Exemption 5 includes a limited privilege for confidential commercial information.  And it reasoned that, "[a]lthough the analogy is not

exact," the Directives "are substantially similar to confidential commercial information generated in the process of awarding a contract," because they are, in essence, "the Government's buy-sell order to its broker." *Id.* at 361–62.  As a result, the Directives were the kind of confidential commercial information that could be protected by Exemption 5.

Finally, the Court considered whether the Directives were, in fact, protected by Exemption 5.  The Court explained that the confidential commercial information privilege—like the analogous civil discovery privilege—is not absolute; instead, it requires balancing the need for confidentiality, as measured by such criteria as "the sensitivity of the commercial secrets involved, and the harm that would be inflicted upon the Government by premature disclosure," against the need for disclosure.  *Id.* at 362–63.  In *Merrill* this balance justified FOMC's delayed release of the Directives, provided that there was a showing that the Directives "contain sensitive information not otherwise available," the release of which "would significantly harm the Government's monetary functions or commercial interests."  *Id.* at 363.  But because the District Court had not made any findings about the impact of immediate disclosure, the case was remanded for further proceedings.  *Id.* at 363–64.

NRDC's argument here, drawing upon the italicized language above, is that the Supreme Court in *Merrill* adopted a hard-and-fast rule with respect to the application of Exemption 5 to government contracting.  It argues that the Court's statement that "the rationale for protecting such information expires as soon as the contract is awarded" is a categorical rule of law that governs this case.  The Court, however, does not read *Merrill* as creating any such inflexible, mechanistic rule.  Just because the rationale for protecting disclosure of competitive bidding information often will expire as soon as a contract is awarded does not mean that this is always so.   Not all bidding processes are the same, and the particular features of a particular bidding

process with respect to governmental assets may counsel a different outcome.  In particular, where disclosure of information from the bidding process as to the award of one asset would compromise the Government's ability to protect its interests in connection with the award of another, construing FOIA to contain such a bright-line rule could severely damage government interests.

A simple illustration is helpful.  Assume the government intends to auction off two parcels of land for gold mining.  It is commonly known that the parcels are, for gold-mining purposes, identical, save that the second parcel contains twice as much gold as the first.  The government prepares its internal estimate of fair market value for the first parcel, which sets a floor below which a bid cannot prevail; it doubles that number to yield its internal estimate of fair market value for the second.  The first parcel is then auctioned off.   Now assume that, for one reason or another, the second parcel cannot be auctioned off right away; and that, in the interim a company that intends to bid on the second parcel has promptly demanded, under FOIA, the government's reports containing its estimate of fair market value for the first parcel.  Under NRDC's inflexible interpretation of Exemption 5, the Government would have no choice in the matter.  It must disclose the reports pertaining to the first parcel.  Yet doing so will compromise the Government's commercial interests as a market participant, by telegraphing to a potential bidder the Government's bidding floor and thereby potentially discouraging a higher bid that would enable the Government to maximize its return.

NRDC urges the Court to adopt this construction of FOIA, which would disadvantage the Government relative to private parties seeking to lease their property.   In urging this damaging construction, NRDC does not rely on the text of FOIA (or its Exemption 5) or on the statute's purposes.  Instead it seizes on the language from *Merrill*, highlighted above.

But the reasoning in *Merrill* does not compel this result.  True, *Merrill* does state that "[t]he theory behind a privilege for confidential commercial information generated in the process of awarding a contract . . . [is] that the Government will be placed at a competitive disadvantage or that the consummation of the contract may be endangered," and that "[c]onsequently, the rationale for protecting such information expires as soon as the contract is awarded or the offer withdrawn."  *Id.* at 360.  But this statement does not bear nearly the freight that NRDC puts on it.  The statement was instead keyed to the familiar, paradigmatic multi-bidder competitive bidding context that the Supreme Court was addressing, in which the post-bidding release of historical bid information should pose no threat to the Government's interests.

The Court in *Merrill* did not have before it, however, a bidding scenario such as that here.  The record here shows that, when the Government seeks to lease for coal-mining its property in the Powder River Basin, there almost never are multiple bids for such leases.  More than 80% of the time there is only one bidder, the mining company with adjacent land, for whom economies of scale and convenience give it a virtually prohibitive inside track on the nearby lease.  In that situation, the Government's private assessment of fair market value, informed by its own metrics, work-product, experience, and data, is the only relevant competition.   In this context, the Government's rationale for protecting this information would *not* necessarily expire as soon as the contract is awarded.  Far from it.

For this reason, although *Merrill* establishes that the confidential commercial information privilege terminates once there is no longer a commercial rationale for withholding the information, and although it may even be fairly read to create a *presumption* against invoking the privilege after a contract is awarded, it should not be read to set a rigid rule mandating, regardless of context, the post-bidding disclosure of Government bidding-process records.  Put

differently, the Supreme Court in *Merrill* had no reason to anticipate the unusual bidding process implicated by this case.

Indeed, the Supreme Court's account of FOIA's history, and the balancing approach that it adopted in applying Exemption 5 to the controversy at hand, both undermine NRDC's claim of a hard-and-fast prohibition on ever invoking that exemption following a bidding process for a government contract.  In *Merrill*, the Court examined FOIA's legislative history, and sought to respect the balance that Congress and the Executive Branch sought to strike in the drafting of Exemption 5.  *See id.* at 357–59.  As recounted by the Court, the concerns expressed in this drafting process were quintessentially pragmatic, functional ones.  *See id.* at 358 (noting concern expressed by federal agencies about compulsory disclosure of information "relating to the purchase or sale of real estate, materials, or other property" or "that might prejudice the Government's bargaining position in business transactions"; agencies urged that "in matters such as the negotiation of contracts, [they] should stand on the same footing as a private party").  Congress's response, as recounted by the Court, was similarly practical.  It adopted a FOIA exemption, Exemption 5, that protected government information prior to the award of a contract or the issuance of an order, decision or regulation, but was also "intended to exempt from disclosure this *and other information and records wherever necessary* without, at the same time, permitting indiscriminate administrative secrecy."  *See id.* at 359 (citation omitted) (emphasis added).   And the Court's application of Exemption 5 in *Merrill* itself reflected an explicit balancing of the need for confidentiality against the value of disclosure, as, the Court noted, is routinely conducted under the Federal Rules of Civil Procedure where a claim of a trade secret has been made.  *Id.* at 361–63.

41

Notably, too, *Merrill* read Exemption 5 as grounded in the discovery privilege for "trade secrets and other confidential . . . commercial information." *Id.* at 357; *see also Wood*, 432 F.3d at 83 (2d Cir. 2005) (Sotomayor, J.) (Exemption 5 "encompasses traditional discovery privileges").  NRDC has not pointed to any case law to the effect that Federal Rule of Civil Procedure 26(c)(1)(G), where this discovery privilege now resides, shields confidential information only where it is explicitly tied to a specific future contract or transaction.  The protection afforded trade secrets instead often survives beyond a single transaction, because revelation of a company's proprietary methodology may harm its interests in future transactions. *See R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 265, 269–70 (6th Cir. 2010).  Here, BLM's methodology for determining fair market value of government property—the benchmark a bidder must meet to secure a lease to mine Government property in the Powder River Basis—is a close, indeed compelling, analogue of a commercial trade secret.  *See In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244–45 (S.D.N.Y. 2009) ("[B]oth state and federal courts have routinely applied the six factors set forth in the Restatement (First) of Torts § 757, comment b, when determining the existence of a trade secret: '(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.'").

Thus, notwithstanding the broad dicta in *Merrill*, the Supreme Court's overall treatment of Exemption 5 in that case points strongly against NRDC's claim here of a categorical rule

compelling post-award disclosure of government bidding information.  And the one court to

address, post-*Merrill*, a viable claim that post-award disclosure could harm the government, in

that case in the context of affecting change order proposals, similarly did not read *Merrill* to

inflexibly mandate disclosure.  *See Taylor-Woodrow Int'l v. U.S. Dep't of Navy*, No. C88-429R,

1989 WL 1095561, at *3 (W.D. Wash. Apr. 5, 1989) ("The purpose of the confidential

commercial privilege is to protect the release of potentially damaging commercial information,

but only while the opportunity to take unfair advantage of the government agency continues to

exist.  In the present action, the process of contracting has not ended.  Normally, once the

government awards a contract, all negotiations end and the contract price becomes fixed.  In that

instance, there would be no reason to continue to withhold the information.  Here, however, the

Navy faces a situation in which plaintiff TBR has already submitted change order proposals

amounting to approximately one fourth of the total contract cost.  If the court releases the cost

estimate sheets, the plaintiffs could take unfair commercial advantage of the Navy.  As a result,

the policy behind applying the commercial confidential privilege in this particular instance is still

very much alive even after the contract award.") (citations omitted).

The Court therefore holds that the confidential commercial information privilege under

Exemption 5 does not, as a matter of law, automatically and always terminate once a contract is

awarded.  Instead, the Court holds that, in rare cases, the Government's legitimate commercial

interests may require the protection of information even after a contract has been awarded.  This

privilege should not be asserted lightly.  Courts may and should examine such assertions with a

searching eye.  But the dicta in *Merrill*, an artifact of the context of that case, should not be read

to deprive the government of the opportunity to establish that its commercial interests would

suffer concrete and particular harm by the forced disclosure under FOIA of bidding information

merely because, at least formally, that information was generated in connection with a contract that has already been awarded.

The Government has made such a showing here.  The record convincingly establishes, and the parties do not dispute, that in most coal leases in the Powder River Basin, the applicant's only competition is the government's internal estimate of fair market value.  *See* Pl. 56.1 ¶ 14 ("Eighty percent of sales in the past twenty years have received only one bid, and no coal lease has ever had more than two bidders on a sale."); Hageman Decl. ¶ 10 ("Of the twenty-eight leases BLM has offered for sale in the Powder River Basin since 1990, only five have received two bids, and none has received more than two bids."); *id.* ¶ 20 ("Under the LBA leasing process, the applicant is usually the only bidder, since other companies would not be able to efficiently use coal reserves adjacent to another company's mine.  This means that BLM's FMV estimate is usually the only potential competition for the LBA tract."); Inspector General at 8 ("The FMV determination is critical in coal leasing because a competitive market generally does not exist for coal leases, therefore, the FMV serves as a substitute for competition."); GAO at 17 ("According to BLM and coal industry representatives, there is limited competition for coal leases because of the significant capital investment and time required to establish new supporting infrastructure to start a new mine or to extend operations of an existing mine to a tract that is not directly adjacent to it.").

The record further establishes that BLM uses a common methodology for determining fair market value, and that its assessment of fair market value in connection with one tract draws significantly on fair market value estimates of, and data from, numerous other coal tracts.  Such comparisons are, indeed, at the heart of the Comparable Sales method, one of the two main methods that BLM uses to estimate fair market value, and of its variant, the DCJ Adjusted

Comparable Sales method.  *See infra* Section I.D.1.  Indeed, each appraisal report in the record considered a substantial fraction of the Powder River Basin tracts that BLM has sold since 1990, including sales from as far back as 1991.  *See* Hageman Decl. ¶ 5 (BLM has leased 27 tracts in the Wyoming portion of the Powder River Basin since the LBA process began in 1990); NARO North Appraisal Report at 33–48 (report dated 2004, utilizing 14 comparable sales); West Antelope II North Appraisal Report at 34–55 (reported dated 2011, utilizing 19 comparable sales); West Antelope II South Appraisal Report at 34–56 (report dated 2011, utilizing 20 comparable sales).  And the Government has convincingly demonstrated, through the credible declaration of Steven Hageman, BLM Wyoming's longtime Minerals Appraiser, that BLM's methodology has been durable over time.[12]  Hageman Decl. ¶ 22 ("BLM has used the same approach to value since the LBA process began in 1990.").

Under these circumstances, disclosure of historical bidding information with respect to tracts in the Powder River Basin would effectively enable a coal company to derive, or come unacceptably close to deriving, the number it must beat in order to lease the next tract for mining.  This, in turn, would deprive the government of the opportunity to obtain meaningfully

---

[12]  NRDC's observation that the information BLM has withheld here "is already far older than the information other courts have presumed is too stale to withhold on commercial-injury grounds," Pl. Reply Br. 18, is, therefore, unpersuasive.  On the record of this case, historical data as to prior BLM leases, based on BLM's common methodology, may help reveal BLM's fair market value as to tracts currently up for lease.  The record, indeed, establishes that in 2004 and in 2011, before this litigation commenced, BLM's appraisal reports considered comparable sales dating back as far as 1991.  *See* NARO North Appraisal Report at 33–48; West Antelope II North Appraisal Report at 34–55; West Antelope II South Appraisal Report at 34–56.  This corroborates BLM's assertion that data from long-prior sales is not stale or irrelevant.  NRDC has not given the Court any concrete basis to question this assertion.  Accordingly, the Court holds, BLM's data from its prior Powder River Basin leases is not stale as long as BLM continues to rely on such information; and here, BLM asserts that it continues to rely on lease sales as far back as 1991.  BLM further represents that its methodology has remained constant since 1990.  *See* Hageman Decl. ¶ 22.

more than its confidential floor price.  It would injure the Government's—and thereby the

public's—valid interest in maximizing the price obtained for leasing its choice land.  FOIA does

not require BLM to release its pricing model or its fair market value estimates derived from the

same model where doing so would enable the coal company neighboring the next tract up for

lease to peg its bid strategically to the government's floor bid.  FOIA does not require that the

Government be thus deprived of its ability to secure a good deal for the taxpayer.

 Accordingly, the Court grants the Government's motion for summary judgment under

Exemption 5, to the extent that the Government seeks to withhold (1) its model, and (2) its fair

market value estimates.

 To the extent the Government seeks to withhold under Exemption 5 materials divulging

its qualitative reasoning process but which do not also divulge its model or its fair market value

estimates, the Court cannot, at this point, grant summary judgment to either side.  It may well be

that requiring the disclosure of BLM's qualitative analyses would enable the coal companies to

predict, with meaningfully greater accuracy, BLM's future estimates of fair market value.  And it

may well be that BLM's qualitative analyses are inextricably bound up in discussions of its

model inputs and fair value estimates.  If so, Exemption 5 similarly applies to such analyses.

 But the Hageman declaration is not clear on this point.  It treats the qualitative and

quantitative portions of the BLM's analyses together, without explanation specifically as to why

release of the agency's purely qualitative assessments would harm its competitive position in the

bidding process.  *See* Hageman Decl. ¶ 22 ("If FMV estimates and valuation methodology from

completed sales were revealed, the mine companies would gain critical insights into the

Government's bargaining position and reduce their bids accordingly.").  The appraisal reports do

not clarify the matter.  They appear to indicate that the qualitative part of BLM's appraisal, the

heart of which appears to be the Comparable Sales method, is analytically distinct from the quantitative part of BLM's appraisal, *i.e.*, the Discounted Cash Flow method; but that these methods merge in the DCF Adjusted Comparable Sales method; and that BLM then attempts to construct a final estimate based on the insights derived from all of these methods.  *See infra* Section I.D.1.  Under these circumstances, the Court simply cannot tell whether or not revealing BLM's qualitative reasoning process would work a substantial harm on the Government's interest in securing an optimal price for coal-mining leases.  Pressed at argument on this point, counsel for the Government was unable to explain, with particularity, why it would do so.  *See* Tr. 29–32.

The Court therefore seeks a clearer explication of this point.  It directs the Government, informed now by the Court's assessment here of the application of Exemption 5 to this context, to submit a new declaration or declarations, concretely explaining why the qualitative statements that have been withheld would, if revealed, work "significant[ ] harm."  *Merrill*, 443 U.S. at 363.  As set forth below, the Court expects that the Government's submission of such materials will trigger renewed motions for summary judgment directed to this discrete open issue.

### C. Exemption 9

Exemption 9 protects from disclosure "geological and geophysical information and data, including maps, concerning wells."  5 U.S.C. § 552(b)(9).  The Government has invoked Exemption 9 to support the withholding of figures in the geologic reports for NARO North and West Antelope II because, it claims, the information contained in the figures comes from "private drill holes."  *See* NARO North Vaughn Index at 7–9; West Antelope II Vaughn Index at 10–11.  The Government argues that the statute's use of the word "wells" should be read to include "drill holes."  Def. Br. 22.

The text of the statute, however, does not support such a reading.  As NRDC notes, "a 'well' is 'a deep hole or shaft sunk into the earth to tap an underground supply of water, gas, oil, etc.'"  Pl. Br. 17 n.5 (quoting *Webster's Deluxe Unabridged Dictionary* 2077 (2d ed. 1979)). Wells are not used to extract solid matter such as coal; they are used to extract liquids or gases. Even the Government's proffered definition of wells indicates as much; it suggests that, to the extent the word "wells" is used as a synonym for "drill holes," that usage occurs in industries in which wells are drilled to extract liquids or gases.  *See* Def. Reply. Br. 14 ("'Wells' is defined by the American Geological Institute as, *inter alia*, '[a] borehole or shaft sunk into the ground for the following purposes: obtaining water, gas, or mineral solutions from an underground source' and '[c]ommonly used as a syn[onym] for borehole or drill hole, esp[ecially] by individuals associated with the petroleum-drilling industry.'") (quoting Dkt. 40, Ex. D at 5 (American Geological Institute, *Dictionary of Mining, Mineral, and Related Terms* 623 (2d ed. 1997)).[13]  In contrast, the same source defines "drill hole" as "a hole in coal or rock made with an auger or a drill."  Dkt. 40, Ex. D at 4.

Simply put, there is no basis on which to conclude that the word "wells" can also refer to drilling holes used to extract coal.  Significantly, the Government concedes that Exemption 9 was enacted to protect oil companies, not coal companies.  *See* Def. Reply Br. 15 ("Although Exemption 9's legislative history suggests that the exemption originated as an effort to protect oil companies from speculators . . . ."); *see also* Tr. 37.  Because FOIA exemptions "are explicitly

---

[13] Even if this definition could be read to suggest that the word "wells" includes coal drilling holes, the Government has not argued that Congress so understood the word when it enacted Exemption 9.  *See* Tr. 37 ("MS. POSCABLO: [W]ells, as we have noted, has been defined by the American Geological Institute as synonymous in certain instances with drill holes.  THE COURT:  Is that the way that Congress would have understood 'wells' when it passed the statute?  MS. POSCABLO: When Congress passed it, I think they were singularly focused on the oil industry . . . .").

made exclusive, and must be narrowly construed," *Milner*, 131 S. Ct. at 1262 (citations omitted), the Court is constrained not to read Exemption 9 so broadly as to encompass the coal drill holes for which the Government has invoked it here.  Accordingly, the Court grants summary judgment to NRDC as to Exemption 9.

## CONCLUSION

For the foregoing reasons:

1.  As to FOIA Exemptions 4 and 9, NRDC's motion for summary judgment is granted, and the Government's motion for summary judgment is denied.

2.  As to FOIA Exemption 5, NRDC's motion for summary judgment is denied in its entirety, and the Government's motion for summary judgment is granted in part.  Specifically, the Court holds that (1) information generated by the Government in connection with leasing tracts in the Powder River Basin can be withheld pursuant to the Exemption where the Government demonstrates that disclosure would significantly harm its commercial interests in its capacity as owner of Powder River Basin tracts to be leased in the future, and (2) the Government has made such a showing both as to the disclosure of its model for determining fair market value of such leases and as to its estimates of fair market value for leasing particular tracts within the Powder River Basin.  To that extent, the Government's motion for summary judgment is granted.  However, the Government has not yet made such a showing with respect to the qualitative reasoning it has used to determine fair market value.  To that extent, the Government's motion for summary judgment is denied.

3.  As to that outstanding issue under Exemption 5, the Government shall, by September 4, 2014, submit a new declaration or declarations, concretely explaining why the qualitative reasoning that has been withheld would, if revealed, work "significant[ ] harm," *Merrill*, 443

U.S. at 363, on its future ability to profitably lease tracts in the Powder River Basin. The Government shall, at the same time, file a new motion for summary judgment as to this discrete point, and submit a letter brief in support. By September 18, 2014, NRDC shall file a new motion for summary judgment as to this point and submit a letter brief in support. By September 25, 2014, the Government shall submit a letter brief in reply in support of its motion; by October 2, 2014, NRDC shall submit a letter brief in reply in support of its motion. Each letter brief is not to exceed five pages in length, single-spaced. The Court does not expect oral argument as to this point. Once the Court has resolved the new motions for summary judgment with respect to the withholding of qualitative reasoning under Exemption 5, the Court expects to seek the parties' guidance as to the appropriate next steps in this case.

The Clerk of Court is respectfully directed to terminate all pending motions.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: August 6, 2014
New York, New York